UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY DELUCA,

        Plaintiff,

v.                                                                  Case No. 06-12552
                                                                  Honorable Patrick J. Duggan

BLUE CROSS BLUE SHIELD OF
MICHIGAN,

        Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION OF PARTIAL SUMMARY JUDGMENT

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on October 31, 2007.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                      U.S. DISTRICT COURT JUDGE

Plaintiff Anthony Deluca ("Plaintiff") filed this putative class action lawsuit on June 8, 2006, alleging that Defendant Blue Cross and Blue Shield of Michigan ("BCBSM") has engaged in conduct violating its fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1101-1461. Presently before the Court is Plaintiff's Motion for Partial Summary Judgment of Liability, filed July 13, 2007, and BCBSM's Motion for Summary Judgment, filed July 25, 2007.[1] The

---

[1] Plaintiff's motion for class certification is pending. Based on the Court's decision with respect to the parties' cross-motions for summary judgment, however, it will deny Plaintiff's motion as moot.

motions have been fully briefed and, on October 25, 2007, the Court held a motion hearing.

I.      **Summary Judgment Standard**

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence

presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

## II. Factual Background

BCBSM is a non-profit health care corporation organized under Michigan law that is authorized to provide pre-paid health insurance and health care services to clients throughout the State. BCBSM also is the parent company of a health maintenance organization ("HMO"), Blue Care Network ("BCN"). BCBSM, directly and through BCN, provides health care products and services to various types of customers, including individuals, employers that sponsor ERISA regulated group health benefit plans for their employees, governmental entities that sponsor group health benefit plans for their employees, and employers providing self-insured health benefits to their employees. BCBSM offers three fundamental forms of health care coverage: a traditional open-access arrangement (allowing the enrollee to obtain health coverage from any medical provider), a preferred provider arrangement ("PPO"), and an HMO through BCN.

These various forms of health care coverage are available on a self-insured or insured (i.e. underwritten) basis. For an insured product, BCBSM bears the risk of loss in return for a premium payment. With a self-insured product, the plan sponsor or plan trust bears the risk of loss and BCBSM merely provides administrative services. The terms and conditions pursuant to which BCBSM provides administrative services to a self-insured group are governed by an "Administrative Services Contract" between BCBSM and the group and amendments thereto. BCBSM has entered into such a contract with the

Flagstar Bank.

Flagstar Bank sponsors the Flagstar Plan which provides *inter alia* health insurance coverage to enrolled Flagstar Bank employees and their dependents. Plaintiff and his spouse, who is a Flagstar employee, are participants in the Flagstar Plan. Flagstar Bank serves as the "named fiduciary" and "administrator" of the Flagstar Plan, as those terms are defined in ERISA. (Def.'s Mot., Ex. 7 at 51.) The Flagstar Plan is self-funded and Flagstar Bank pays benefits out of its general assets. (*Id*. at 51 & 53.) While Flagstar Bank "has sole responsibility for the administration of the Plan," it retains the authority to delegate fiduciary responsibilities to others. (*Id*. at 48.)

Pursuant to that authority, Flagstar Bank entered into an Administrative Services Contract with BCBSM (the "Flagstar ASC") in 1996, which Flagstar Bank has renewed annually. (Def.'s Mot., Ex. 8.) The Flagstar Plan is not a party to the Flagstar ASC, although Flagstar Bank has signed addenda to the contract as sponsor of the plan. The Flagstar ASC sets forth the parties' general responsibilities with respect to the Flagstar Plan.

The Flagstar ASC specifically limits BCBSM's responsibilities under the contract to the administration of the health care coverage provided to enrollees under the Flagstar Plan. Article II of the Flagstar ASC states:

> BCBSM shall administer Enrollees' health care coverage(s) in accordance with BCBSM's standard operating procedures for comparable coverage(s) offered under a BCBSM underwritten program, any operating manual provided to the Group, and this Contract. . . .

4

> The responsibilities of BCBSM pursuant to this Contract are limited to providing administrative services for the processing and payment of claims.

(*Id*. at 0296.) BCBSM's role as a fiduciary with respect to the plan also is circumscribed in the Flagstar ASC:

> If the Group's health care program is subject to the Employee Retirement Income and Security Act of 1974 (ERISA), it is understood and agreed that BCBSM is neither the Plan Administrator, the Plan Sponsor, nor a named fiduciary of the Group's health care program under ERISA. The provisions of this paragraph, however, shall not release BCBSM from any other responsibilities it may have under ERISA.

(*Id*.)

On March 18, 2003, BCBSM and Flagstar Bank executed an addendum to the Flagstar ASC. (*Id*. at 0319-0331.) This addendum further outlines the services BCBSM agrees to provide to the plan pursuant to the Flagstar ASC: "During the continuance of the ASC, BCBSM will manage, operate and administer Coverage(s) and perform the services set forth in attached Exhibit I with respect to benefits provided to Enrollees under GHP [the Flagstar Group Health Plan]." (*Id*. at 0319.) The following "Administrative Services" are set forth in Exhibit I to the addendum:

> •**ACTUARIAL AND STATISTICAL**: Determining claims projections and pricing administrative services and stop-loss coverage.
>
> •**CLAIMS ADJUDICATION**: Examining Claims and determining payment levels, including data entry of Claims, maintenance of Claims experience files, use of medical consultants, review of utilization and reasonable and customary charges, and coordination of benefits (COB).

- **CLAIMS/MEMBERSHIP INQUIRIES**: Handling inquiries– written, phone, or in-person– related to membership, benefits, Claims payments and Claims payment denial.

- **DATA AGGREGATION**: Conducting data analyses for Health Care Operations using data that BCBSM created or received for, on behalf of, or from GHP and for, on behalf of, or from other Covered Entities for whom BCBSM acts as a Business Associate.

- **ENROLLMENT SERVICE**: Preparing proposals and registering, coding, and preparing new applications.

- **FINANCIAL SERVICES**: Performing financial functions, such as cash receipts, cash disbursements, payroll and general ledger processing, general accounting, preparation of financial statements, billing, group settlements, and wire transfers.

- **HEALTH CARE OPERATIONS**: Conducting activities on behalf of GHP that relate to the functions of GHP that make it a Health Plan.

- **MEMBERSHIP FILE UPDATES**: Maintaining membership status files and processing inter-plan transfers and contract conversions and changes, subject to conversion fees.

- **MEMBERSHIP VALIDATION**: Verifying membership by wire, listing, CRT query, or other methods before or during adjudication.

- **OTHER SERVICES TO GHP**: Contacting Group and Enrollees regarding adding, changing, or renewing coverage.

- **PAYMENT ACTIVITIES**: Conducting activities relating to Claims payment and management, coverage determination, benefits provision and eligibility, risk adjustment, utilization review, medical necessity determination, and all related functions affecting obligations and amounts to pay for health benefits coverage.

> - **PHARMACY BENEFITS MANAGEMENT**: Providing or arranging (if Group elects to include pharmacy benefits in GHP) the provision of prescription drug management services, such as mail-order and network pharmacy dispensing, and disease and drug utilization management.
>
> - **PROVIDER NETWORKS**: Establishing, arranging, and managing provider networks, including managed care point-of-service, preferred provider, and traditional networks through contractual arrangements with preferred participating hospitals, physicians, and other health care providers and with other Health Plans within designated services areas.
>
> - **RESEARCH**: Systematically investigating, including research development, testing, and evaluation in order to develop or contribute to generalizable knowledge.
>
> - **STANDARD REPORTS**: Generating monthly statements and Claim listings . . .
>
> - **STANDARD TRANSACTIONS AND OTHER ELECTRONIC DATA INTERCHANGE**: Conducting health care administrative and financial transactions for which standards have been established in 45 C.F.R. Part 162 as Standard Transactions, and engaging in such other electronic data interchange as necessary or appropriate to BCBSM's activities under the ASC.

(*Id*. at 0330-0331.) The rates BCBSM pays Michigan hospitals and other health care providers when it administers claims on behalf of Flagstar Plan enrollees pursuant to the Flagstar ASC and the amendments thereto is based on the rates that BCBSM has negotiated with those health care providers.

BCBSM negotiates with Michigan health care providers, including hospitals, to set the reimbursement rates that BCBSM will pay for the health care services provided to BCBSM enrollees. BCBSM does not negotiate rates for the individual health care plans

7

it services. (Def.'s Mot, Ex. 4 at Resp. No. 17.) Instead, BCBSM negotiates rates for each of its three health care products: open access, PPO, and HMO. (*Id*. at Resp. No. 12.) As Gerald Noxon, Director of Hospital Contracting and Reimbursement for BCBSM, explains: "To offer the most competitive rate structure to its customers, BCBSM aggregates its purchasing power and collectively negotiates reimbursements rates that it will pay to Michigan hospitals for all three forms of its health care coverage." (Def.'s Mot., Ex. 5 at ¶ 3.) Thus, BCBSM negotiates a hospital reimbursement rate for its traditional open-access form of health care (referred to as its "Traditional Rate"), a rate for its PPO form of health care (referred to as its "Trust Rate"), and a rate for its HMO form of health care (referred to as its "BCN Rate"). (*Id*. & Ex. 4 at Resp. No. 12.)

These negotiated rates are memorialized in three forms of written hospital agreement: (1) a Participating Hospital Agreement ("PHA") for the traditional open access arrangement; (2) a Trust Hospital Agreement ("THA") for the PPO arrangement; and (3) a BCN Agreement ("BCNA") for the HMO arrangement. (Def.'s Mot., Ex. 6 at Resp. Nos. 21-24.) Additionally, BCBSM has entered into Letters of Understanding ("LOUs") with many hospitals that modify or amplify the terms of the existing agreements. (Def.'s Answer at ¶¶ 44-45, 57-58.) Pursuant to its agreements with Michigan hospitals, BCBSM bears the exclusive contractual obligation to pay the hospital the agreed-upon reimbursement rate. (Def.'s Mot., Ex. 4 at Resp. Nos. 10, 17.) Self-insured plans then reimburse BCBSM for those payments pursuant to the ASC between the plans and BCBSM. (*See, e.g.,* Def.'s Mot. Ex. 8 at 0297.)

8

BCBSM only began negotiating hospital rates for BCN in or around 2004. (Def.'s Mot., Ex. 2 at 15.) At the time, BCN was paying higher hospital rates than BCBSM was paying for its traditional and trust arrangements. (*Id.* at 17.) BCBSM thereafter negotiated lower hospital rates for BCN in exchange for higher rates for its traditional open access and PPO products. (*Id.* at 18-19.)

Plaintiff filed this action, alleging that BCBSM's conduct in negotiating lower rates for BCN in exchange for higher rates for its other products constitutes a breach of its fiduciary duties in violation of Sections 404(a)(1) and 406(b) of ERISA, 29 U.S.C. §§ 1104 & 1006.

## III. Applicable Law and Analysis

ERISA defines a "fiduciary" for purposes of the statute as follows:

> A person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advise for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibilities to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21).[2] Section 404 of ERISA sets forth the standard of care by which a fiduciary must discharge his duties with respect to a plan and provides that a fiduciary must discharge his duties "solely in the interest of the participants and beneficiaries." 29

---

[2]Although the statute refers to a fiduciary as a person, ERISA's definition of a "person" extends to a corporation. 29 U.S.C. § 1002(9).

U.S.C. § 1104(a). Section 406 of ERISA prohibits various types of self-dealing by fiduciaries. 29 U.S.C. § 1106. Section 406(b) specifically prohibits the fiduciary from engaging in the following transactions between the fiduciary and the plan:

> (1) deal with the assets of the plan in his own interest or for his own account,
>
> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
>
> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b). These duties and prohibitions, however, apply only to the extent the party is acting as a "fiduciary."

As the Supreme Court has explained, "[T]he statute does not describe fiduciaries simply as administrators of the plan, or managers or advisers. Instead it defines an administrator, for example, as a fiduciary only 'to the extent' that he acts in such a capacity in relation to a plan." *Pegram v. Herdrich*, 530 U.S. 211, 225-26, 120 S. Ct. 2143, 2152 (2000). The Court further explained that the statute does not preclude a fiduciary from wearing different hats or from having financial interests adverse to plan participants. *Id.* at 225, 120 S. Ct. at 2152. Instead the statute only requires a fiduciary to wear "only one hat at a time, and [to] wear the fiduciary hat when making fiduciary decisions." *Id.* at 225, 120 S. Ct. at 2143.

Thus, even if a person is an ERISA fiduciary for some purposes, he is not a

10

fiduciary with respect to every action that he takes. As the Sixth Circuit has stated: "'Fiduciary status . . . is not an all or nothing concept, . . .'" *Briscoe v. Fine*, 444 F.3d 478, 486 (6th Cir. 2006) (quoting *Moench v. Robertson*, 62 F.3d 553, 561 (3d Cir. 1995)). As a result, to make out a claim for breach of fiduciary duty under ERISA, a plaintiff must show that the defendant was acting in his capacity as a fiduciary at the time he took the actions of which the plaintiff complains:

> In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.

*Id*. at 226, 120 S. Ct. at 2152-53. Thus rather than asking whether BCBSM's conduct in negotiating hospital rates for its various health care products harmed certain participants and beneficiaries, the Court must determine whether BCBSM was acting as a fiduciary with respect to the Flagstar Plan when it negotiated those rates.

This determination depends upon whether BCBSM was exercising any "discretionary authority or discretionary control respecting" the management or administration of the Flagstar Plan or Flagstar Plan assets when it negotiated hospital rate arrangements for its three health care products (tradition, PPO, and BCN). *See* 29 U.S.C. § 1002(21). The Court does not believe that it was. While BCBSM exercises discretionary authority in its administration of the Flagstar Plan, including when it pays Michigan hospitals for services provided to plan enrollees, it was not engaged in those functions when it negotiated rate contracts with those hospitals.

11

The undisputed evidence establishes that when BCBSM negotiates hospital reimbursement rates, it does so generally for its three health care products: its traditional health care arrangement, its PPO, and the BCN. BCBSM does not negotiate rates for any specific ERISA plan. In fact as set forth in the previous section, nothing in the Flagstar ASC or any amendment thereto, charges BCBSM with a duty to negotiate hospital rates for the Flagstar Plan or to act in the plan's interests when negotiating hospital rates.

Plaintiff argues otherwise, referring to BCBSM's obligation in the March 18, 2003 addendum to the Flagstar ASC to "[e]stablish[], arrang[e], and manag[e] provider networks . . . through contractual arrangements with preferred participating hospitals . . ." (Def.'s Mot., Ex. 8 at 0331.) Plaintiff's interpretation of this clause to impose a fiduciary duty on BCBSM when it negotiates those contractual arrangements is much broader than the plain language of the clause itself and is inconsistent with the clear limitation on BCBSM's duties under the ASC to provide only "administrative services for the processing and payment of claims." (*Id*. at 0296.) Although BCBSM's promise to maintain provider networks requires it to enter into contractual arrangements with hospitals, BCBSM makes no promises to the Flagstar Plan (or Flagstar Bank) in the Flagstar ASC or the amendments thereto with respect to the terms of those contracts. Moreover, when BCBSM contracts with Michigan hospitals to pay certain rates, only BCBSM is obligated to pay those rates. In other words, the agreements between BCBSM and Michigan hospitals do not obligate any ERISA plan to pay the hospital rates set forth in those agreements.

Whether a particular plan will pay those rates depends upon whether the plan– here the plan sponsor, Flagstar Bank– subsequently decides to select BCBSM as its administrator or insurer. As BCBSM states:

> The independent party negotiating with BCBSM [on behalf of a plan] is free to attempt to negotiate a different health care reimbursement rate formula so as to achieve lower health care costs. Or, if it believes the expected cost of health care based on BCBSM's rates is not as competitive as the health care cost determined by rates negotiated by BCBSM's competitors, it is free not to contract or renew its contract with BCBSM.

(Def.'s Br. in Supp. of Mot. at 17.) In other words, BCBSM markets its various products to health insurance plans– a key component of which is the reimbursement structure BCBSM has negotiated with health care providers– and the plans are free to select one of BCBSM's products or they may choose to secure a product from a different health care corporation.

BCBSM may not inform self-insured plans that it has negotiated lower hospital rates for its BCN than its traditional and PPO products. However when the plans decide whether to contract with BCBSM for one of its products, they have received from BCBSM detailed information regarding the hospital rates that the plans will be obligated to pay, the discounts BCBSM has negotiated for the particular health care product from the hospital's normal rates, and the anticipated annual cost of health care coverage for the plan. If an entity then selects a BCBSM product for its plan, BCBSM is not breaching its fiduciary duties to the plan when it subsequently processes and pays hospital claims at the rates the entity agreed to pay when it contracted with BCBSM. *See Mulder*, 432 F. Supp.

2d at 459 (quoting *Fechter v. Connecticut Gen. Life Ins. Co.*, 800 F. Supp. 182, 199-200 (E.D. Pa. 1992) ("If a specific contractual term is bargained for at arm's length, adherence to that term, at a pre-determined price, is not a breach of fiduciary duty.") *Mulder* provides guidance in this case.

The named plaintiff in *Mulder* was a participant in his employer's sponsored health and prescription drug benefit plan. He claimed that the pharmacy benefit manager ("PBM") that contracted with the plan to manage its prescription drug program violated its fiduciary duties by entering into contracts with certain drug manufacturers that provided for kickbacks and rebates to the PBM when plan participants used those manufacturers' drugs. 432 F. Supp. 2d at 453. The District Court for the District of New Jersey rejected the plaintiff's claims, concluding that the PBM "operated independently in negotiating contracts with drug manufacturers" and that "it was for Oxford [the plan] to decide if it wanted to include those drugs on its PDL [Performance Drug List which includes preferred drugs in certain therapeutic classes]." *Id*. at 458.

Similar reasoning supported the Seventh Circuit's conclusion in *Schulist v. Blue Cross of Ohio*, 717 F.2d 1127 (1983), that the defendants were not fiduciaries under ERISA with respect to the premiums they charged. In *Schulist*, trustees of a health plan alleged that Blue Cross of Iowa and Blue Shield of Iowa ("BC/BS") breached their fiduciary duties when they retained a premium surplus. This surplus was the amount BC/BS received in premiums from the health plan minus the sum of the amounts BC/BS paid out to cover claims and a few miscellaneous fees that BC/BS charged (e.g. claims

14

administration and office expense). *Id*. at 1129. The court concluded that BC/BS were not acting as fiduciaries in failing to return the premium surplus because they did not exercise discretionary authority or control with respect to the premium rates the plan's trustee agreed to pay BC/BS and the contract between the trustee and BC/BS provided that the premium surplus would be retained by BC/BS:

> We think that BC/BS does not exercise discretionary authority with respect to the setting of rates. Before entering into the Contract which included the rates alleged to have provided it with unreasonable compensation, BC/BS had no relationship to the Trust at all. After competitive bidding, BC/BS was selected as medical carrier presumably because its premium rate . . . was more favorable than other bids submitted. . . . BC/BS had no control over what plan and what hospital service organization were chosen for the Trust. After the Contract was signed, BC/BS may have come into a fiduciary relationship to the Trust with respect to the processing of claims, the area over which BC/BS had discretionary authority. . . . As to the terms and conditions upon which it became a provider, therefore, BC/BS entered an arm's length bargain presumably governed by competition in the marketplace. . . . We hold, therefore, that BC/BS was not a fiduciary under ERISA with respect to the selection of a hospital service organization and as to its compensation as a provider of Plan benefits.

717 F.2d at 1131-32.

Finally, in *Chicago District Counsel of Carpenters Welfare Fund v. Caremark, Inc.*, the Seventh Circuit rejected a self-insured trust fund's breach of fiduciary duty claims against a third-party pharmacy benefits manager, Caremark, ruling that Caremark was not an ERISA fiduciary when it negotiated drug prices with retail pharmacies and/or rebates and discounts with drug manufacturers. 474 F.3d 463, 471-72 (2007). The fund

and Caremark entered into contracts which required the fund to pay set prices for drugs and the court found nothing in the contracts requiring Caremark to pass-through any additional saving it managed to negotiate with retailers or requiring or authorizing Caremark to enter into agreements with drug manufacturers on behalf of the plan. *Id*. at 472, 474-76. As the contract between Caremark and the plan did not impose upon Caremark the obligation or discretion to negotiate rates with pharmacy retailers or manufacturers, the court concluded that Caremark was not acting in a fiduciary capacity with respect to the plan when it negotiated prices and/or rebates and discounts with manufacturers. *Id*. Similarly, the Court finds nothing in the Flagstar ASC obligating or granting discretion to BCBSM to negotiate hospital rates on behalf of the Flagstar Plan.

The court is not convinced otherwise by the district court's holding in *The Sixty-Five Security Plan v. Blue Cross and Blue Shield of Greater New York*, 583 F. Supp. 380 (S.D.N.Y. 1984)– a case on which Plaintiff relies. In that case, the Sixty-Five Security Plan ("Security Plan") entered into an agreement with Blue Cross and Blue Shield of Greater New York ("Blue Cross"), whereby Blue Cross assumed responsibility for various aspects of Security Plan's health care program, including the payment of claims. *Id*. at 382. Security Plan paid sums of money to Blue Cross on a regular basis, which Blue Cross was to apply to the payment of claims and to its own fees. *Id*. Blue Cross was obligated to then return the rest to Security Plan. *Id*. Security Plan alleged that Blue Cross violated its fiduciary duties when it granted and paid certain claims from fund assets, as Security Plan had agreed to pay Blue Cross a percentage of all claims granted.

16

583 F. Supp. at 385-86 & n. 9. Unlike the present matter, however, the conduct in which Blue Cross was engaged when it allegedly breached its fiduciary duties– approving and paying claims– was conduct specifically delegated to it under the parties' contract. *Id*. at 385.

Based on the above, the Court finds that BCBSM was not acting as a fiduciary of the Flagstar Plan when it negotiated rates with Michigan hospitals. The Court therefore holds that BCBSM's conduct in negotiating lower rates for the BCN in exchange for increased rates for its traditional and PPO products did not violate Sections 404 or 406 of ERISA. In reaching this conclusion, the Court rejects Plaintiff's interpretation of Section 406 of ERISA– i.e., that the entity need not be acting in its capacity as a fiduciary when it engaged in the conduct alleged to constitute a violation of the statute, but simply must have the status of a fiduciary. (Pl.'s Resp. Br. at 15.) In this Court's view, the Supreme Court made it clear in *Pegram* that ERISA's fiduciary rules only apply when a party *acts* in a fiduciary manner. *Pegram*, 530 U.S. at 225, 120 S. Ct. at 2152-53 ("In *every* case charging a breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person *was acting* as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint") (emphasis added); *see also Hunter v. Caliber*, 220 F.3d 702, 724 (6th Cir. 2000) (rejecting the plaintiffs' claim that the defendant engaged in a prohibited transaction because "by its own terms, Section 1106 applies only to those who act in a fiduciary capacity" and the

17

court already had concluded that the defendant was not acting in a fiduciary capacity when it engaged in the conduct underlying the plaintiffs' Section 1106 claim.)

Accordingly,

**IT IS ORDERED**, that Defendant Blue Cross and Blue Shield of Michigan's Motion for Summary Judgment is **GRANTED**;

**IT IS FURTHER ORDERED**, that Plaintiff's Motion for Summary Judgment of Liability is **DENIED**;

**IT IS FURTHER ORDERED**, that Plaintiff's Motion for Class Certification is **DENIED AS MOOT**.

                                              s/PATRICK J. DUGGAN
                                              UNITED STATES DISTRICT JUDGE

Copies to:
Stephen F. Wasinger, Esq.
John H. Eggertsen, Esq.
K. Scott Hamilton, Esq.
Leo A. Nouhan, Esq.
Robert P. Hurlbert, Esq.